Chief Justice Mike McGrath delivered the Opinion of the Court.
***376 ¶ 1 This is an appeal from a Twelfth Judicial District Court order terminating the parental rights of A.M., the putative father of P.T.D. We affirm.
¶ 2 We restate the issue on appeal as follows:
Whether the District Court was required to comply with the requirements of the Indian Child Welfare Act when terminating ***377 A.M.'s parental rights.
PROCEDURAL AND FACTUAL BACKGROUND
¶ 3 P.T.D. was born on February 28, 2014. In early March 2015, P.T.D. was taken from his birth mother's (Birth Mother) care after Birth Mother was found passed out and intoxicated while P.T.D. was in her custody. On March 3, 2015, the Department of Public Health and Human Services, Child and Family Services Division (the Department) filed a Petition for Emergency Protective Services, Adjudication as Youth in Need of Care and Temporary Legal Custody, identifying P.T.D. as an Indian child subject to the Indian Child Welfare Act (ICWA). P.T.D. is a member of or eligible for membership in the Fort Peck Indian Tribe.
¶ 4 On March 4, 2015, the District Court signed an order granting the Department's petition for emergency protective services and scheduled a show cause hearing. That *621 same day, the Department sent notice of the March 12, 2015 show cause hearing to the Fort Peck Indian Tribe. Although Birth Mother was successfully served with the Department's petition and show cause order, A.M. was unable to be located. On March 11, 2015, the Department filed a motion to dismiss the petition because P.T.D.'s maternal great-aunt was given custody by the Fort Peck Tribal Court. The District Court dismissed the case on March 12, 2015.
¶ 5 On May 19, 2015, P.T.D.'s maternal great-aunt gave up custody. At that time, Birth Mother was incarcerated for underage drinking and treatment court violations. P.T.D. was then placed with his maternal aunt. On May 29, 2015, the Department filed a second Petition for Emergency Protective Services, Adjudication as Youth in Need of Care and Temporary Legal Custody. On June 2, 2015, the District Court ordered Birth Mother and A.M. to appear for a show cause hearing on June 12, 2015. A notice was also sent to the Fort Peck Indian Tribe regarding the Department's petition and District Court's order for a show cause hearing. The hearing was reset for June 22, 2015, because no qualified expert witness was available to testify as to P.T.D.'s placement.
¶ 6 At the June 22 show cause hearing Trudy Johnson, an ICWA qualified expert witness, testified that placement with P.T.D.'s maternal aunt was appropriate. On June 26, 2015, the District Court granted the Department's May 29 petition for temporary legal custody and adjudicated P.T.D. as a youth in need of care, based on the stipulation of the parties. The District Court ordered the Department to develop and circulate treatment plans for both parents by June 29, ***378 2015.
¶ 7 The District Court approved of the Department's proposed treatment plan for Birth Mother, granted the Department temporary legal custody for six months, and ordered the Department to submit status reports every sixty days. Because of questions regarding paternity, the Department did not create a treatment plan for A.M. Counsel for A.M. advised that A.M. was not present at the dispositional hearing because he did not receive notice.
¶ 8 In an August 27, 2015 status report, the Department noted that Child Protection Services (CPS) was unable to maintain contact with A.M. as a possible placement for P.T.D. CPS had sent a certified letter to A.M.'s last known address on October 1, 2015. Although the letter was received on October 8, 2015, CPS did not receive a response from A.M. An October 27, 2015 status report reflects that CPS was still unable to contact A.M. regarding placement of P.T.D.
¶ 9 On January 13, 2016, the District Court granted the Department's Petition to Extend Temporary Legal Custody for an additional six months and ordered the Department to submit a status report every sixty days. A March 4, 2016 status report stated that CPS still had not heard from A.M. On March 25, 2016, CPS sent a second certified letter to A.M.'s last known address. Although the letter was received a second time, a status report on April 14, 2016, reflects that CPS was still waiting to hear from A.M. A.M.'s attorney had not been in contact with A.M. since November 2015.
¶ 10 On June 1, 2016, Birth Mother was released from the Hill City Detention Center and transported to the Carole Graham Home-a treatment facility-in Missoula. Birth Mother expressed to staff members at the Carole Graham Home that she did not want to parent P.T.D. or stay at the facility. The Department began looking for a permanent placement for P.T.D., which included reaching out to A.M. The Department continued to have difficulty making contact with A.M. However, at the July 11, 2016 hearing to extend temporary legal custody, A.M.'s attorney testified that she was finally able to speak with A.M. through Facebook. A.M.'s attorney provided CPS with two phone numbers. CPS contacted A.M., who agreed to submit to a paternity test.
¶ 11 During this time, the child's placement was with his maternal aunt. However, when P.T.D.'s maternal aunt moved, P.T.D. was left in the care of his maternal great-grandfather. When P.T.D.'s maternal great-grandfather could no longer care for P.T.D. on his own, the Department filed a Notice of Change of Placement and Request to Set Placement Hearing. P.T.D. was subsequently *622 placed in foster care ***379 while CPS waited for A.M.'s paternity results.
¶ 12 At a July 11, 2016 hearing on the Department's petition to extend temporary legal custody, John Colliflower, a qualified expert witness, testified that P.T.D.'s placement with his foster family was appropriate under ICWA. At the hearing, A.M.'s attorney acknowledged that A.M. was not listed on P.T.D.'s birth certificate and A.M. had failed to complete a paternity test. On July 12, 2016, the District Court extended custody for six months and ordered status reports from the Department every ninety days.
¶ 13 An October 7, 2016 status report reflected that A.M. had not taken a paternity test. However, both Birth Mother and A.M. agreed to attend a family engagement meeting scheduled for October 11, 2016. A.M. failed to attend or call in to the meeting. During this time, Birth Mother expressed to Child Protection Specialist Dana Kjersem a desire to relinquish her parental rights.
¶ 14 Following a permanency plan and placement hearing, the District Court approved the Department's proposed permanency plan on November 17, 2016. Counsel for A.M. was present at the hearing, but A.M. was not. At no time did A.M.'s attorney object to P.T.D.'s placement.
¶ 15 On January 12, 2017, the Department filed a petition to terminate A.M.'s parental rights as P.T.D.'s putative father. At a March 20, 2017 hearing, Birth Mother formally relinquished her parental rights. The District Court held a hearing on the petition regarding A.M.'s parental rights on April 10, 2017. A.M.'s attorney appeared by the judicial video network and A.M. appeared by telephone. On April 25, 2017, the District Court issued an order terminating A.M.'s parental rights. The District Court found that the Department had made reasonable efforts to attempt to reunite P.T.D. with his family, but that A.M. had not cooperated. By that time, the child had been in foster care for nearly two years, and A.M. had no meaningful contact with P.T.D. and had not established a relationship with the child. The District Court held that based on the record, including the ICWA testimony presented at a previous hearing, termination of A.M.'s parental rights was in the child's best interest. A.M. appeals.
STANDARD OF REVIEW
¶ 16 A district court's ultimate decision to terminate parental rights is reviewed for abuse of discretion. In re A.N.W. , 2006 MT 42, ¶ 29, 331 Mont. 208, 130 P.3d 619. A court abuses its discretion if it acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice.
***380 In re A.N.W. , ¶ 29.
¶ 17 We review a district court's findings of fact to determine whether those findings are clearly erroneous. In re A.N.W. , ¶ 28. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence, or if review of the record convinces this Court a mistake was made. In re J.B. , 2016 MT 68, ¶ 10, 383 Mont. 48, 368 P.3d 715. We review a district court's conclusions of law for correctness. In re A.N.W. , ¶ 28. This Court will not reweigh conflicting evidence or substitute its judgment for the district court's regarding the strength of the evidence. In re A.N.W. , ¶ 29.
DISCUSSION
¶ 18 Whether the District Court was required to comply with the requirements of the Indian Child Welfare Act when terminating A.M.'s parental rights.
¶ 19 ICWA establishes the "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes...." 25 U.S.C. § 1902. When terminating parental rights to an Indian child, a state court must find "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d). However, in Adoptive Couple v. Baby Girl , 570 U.S. 637, 651, 133 S.Ct. 2552, 2562, 186 L.Ed.2d 729 (2013), the United States Supreme Court held that the active efforts requirement does not apply when an Indian parent has abandoned "an Indian child prior to birth and that child has never been in the Indian parent's legal or physical custody."
*623 Baby Girl , 570 U.S. at 651, 133 S.Ct. at 2562. The Supreme Court reasoned that 25 U.S.C. § 1912(d) only applies when termination of parental rights would result in the breakup of an Indian family. Baby Girl , 570 U.S. at 651-52, 133 S.Ct. at 2562.
¶ 20 The Supreme Court ruled that § 1912(d) and the active efforts requirement did not bar termination of Birth Father's parental rights because he failed to provide financial assistance to Baby Girl or Birth Mother despite having the ability to do so, and "made no meaningful attempts to assume his responsibility of parenthood" during Birth Mother's pregnancy and the first four months of Baby Girl's life. Baby Girl , 570 U.S. at 644, 133 S.Ct. at 2558. This Court applied Baby Girl and held it dispositive in In re J.S. , 2014 MT 79, 374 Mont. 329, 321 P.3d 103. This Court held that § 1912(d) did "not provide a basis to ***381 overturn the [d]istrict [c]ourt's award of guardianship to the foster family based on the State's alleged failure to make 'active efforts' " because no relationship between the birth father and the child existed and because they had limited personal contact throughout the proceedings of the case. In re J.S. , ¶ 31.
¶ 21 When terminating parental rights, ICWA also requires that courts hear testimony from qualified expert witnesses regarding whether "the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f). However, placing emphasis on "continued custody," the Supreme Court has stated that 25 U.S.C. § 1912(f)"does not apply in cases where the Indian parent never had custody of the Indian child." Baby Girl , 570 U.S. at 648, 133 S.Ct. at 2560. The Supreme Court concluded this comported "with the statutory text demonstrating that the primary mischief ... ICWA was designed to counteract was the unwarranted removal of Indian children from Indian families due to the cultural insensitivity and biases of social workers and state courts." Baby Girl , 570 U.S. at 649, 133 S.Ct. at 2561.
¶ 22 In Baby Girl , the Supreme Court held that the State of South Carolina did not need to comply with the qualified expert witness testimony requirement pursuant to § 1912(f) because Baby Girl's biological father never had legal or physical custody of her prior to the initiation of the case. Baby Girl , 570 U.S. at 650-51, 133 S.Ct. at 2562. This Court made a similar holding in In re S.B.C. , 2014 MT 345, 377 Mont. 400, 340 P.3d 534. This Court found that Biological Father was unwilling or unable to exercise his custodial rights regarding his Indian child, despite having opportunities to do so. Specifically, Biological Father initially failed to appear for paternity tests, and did not attempt to be a placement option for his child or visit his child after paternity was established. This Court noted that although Biological Father had minimal visits with his child, Biological Father testified that he never had the child in his care. In re S.B.C. , ¶ 37.
¶ 23 Here, A.M. argues the Department failed to satisfy two ICWA requirements: § 1912(d) and (f). First, A.M. argues that the Department failed to prove beyond a reasonable doubt that it made active efforts to reunify A.M. and P.T.D. Conversely, the Department alleges that a finding of active efforts was not required because A.M. never had custody of or established a relationship with P.T.D. Second, A.M. argues that the District Court should be reversed and the case be remanded because there was no testimony from a qualified expert witness at the termination hearing. The Department alleges that lack ***382 of expert testimony at the termination hearing should not nullify the District Court's order because § 1912(f) did not apply to the termination hearing.
¶ 24 Although the District Court order does not comply with ICWA requirements, the § 1912 ICWA provisions do not apply because a family relationship does not exist. A.M. is not listed on the birth certificate as P.T.D.'s father. At the termination hearing on April 10, 2017, A.M. stated that he has not provided any financial support to P.T.D. or P.T.D.'s caretakers. A.M. also explained that he never had custody of P.T.D. and has only seen P.T.D. on two occasions. The first time A.M. met P.T.D. was when P.T.D. was one year old and their contact lasted about an hour to an hour and a half. The second and only other time A.M. and P.T.D. had contact was for about one minute. Child Protection Specialist Dana Kjersem testified that A.M. has made no efforts to *624 take care of P.T.D., failed to participate in a scheduled family meeting, failed to show up for two scheduled paternity tests, and has never called, spoken with, or left a message for her or other Department personnel regarding P.T.D. Overall, Kjersem testified that A.M. has not expressed any interest in parenting P.T.D.
¶ 25 Substantial evidence exists to support the District Court's conclusion that A.M. has had no meaningful contact with P.T.D. and has not established any relationship with him. A.M. has not supported P.T.D. financially and has failed to take meaningful steps to assume the responsibility of parenthood.
¶ 26 Finally, A.M. argues that the District Court's oral judgment at the end of the termination hearing, minute entry, and order differ in the way they define the active efforts requirement and therefore the District Court's decision must be reversed. Because a finding of active efforts was not necessary, A.M.'s argument that the District Court should be reversed because the language in the District Court's oral pronouncement, minute entry, and order all differ regarding its finding of active efforts is immaterial.
CONCLUSION
¶ 27 The District Court's decision to terminate A.M.'s parental rights was not clearly erroneous. The 25 U.S.C. § 1912 requirements of ICWA are inapplicable to the facts of this case. A.M. never had custody and never had a meaningful family relationship with P.T.D.
¶ 28 Affirmed.
We Concur:
JAMES JEREMIAH SHEA
BETH BAKER
LAURIE McKINNON
DIRK M. SANDEFUR